**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 1:24-cv-23819-RKA

OMAR ROMAY, LIQUIDATING TRUSTEE,

Appellant,

v.

MEDIASET ESPAÑA COMMUNICACIÓN S.A.,

Appellee.

______________________________________________/

# LIQUIDATING TRUSTEE'S INITIAL APPELLANT'S BRIEF

Paul Steven Singerman
Florida Bar No. 378860
Paul A. Avron
Florida Bar No. 50814
BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

Isaac M. Marcushamer
Florida Bar No. 060373
Monique D. Hayes
Florida Bar No. 0841573
DGIM LAW PLLC
2875 NE 191st Street, Ste. 705
Aventura, FL 33180
Telephone: (305) 763-8708

*Co-Counsel for Appellant, Omar Romay, Liquidating Trustee*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ..................................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................................ 1

PRELIMINARY STATEMENT .................................................................. 1

STATEMENT OF APPELLATE JURISDICTION ............................................ 4

STATEMENT OF ISSUES PRESENTED FOR REVIEW .................................... 5

STANDARD OF APPELLATE REVIEW ....................................................... 5

STATEMENT OF THE CASE ................................................................... 6

SUMMARY OF THE ARGUMENT ............................................................ 19

ARGUMENT ........................................................................................ 22

I. The Bankruptcy Court Committed Reversible Error in Concluding That the Liquidating Trustee Failed to Establish Actual Intent to Hinder, Delay, or Defraud Under § 548(a)(1)(A).. ................................ 22

II. The Bankruptcy Court Committed Reversible Error in its Valuation of a Contingent Liability-the Claims Asserted in State Court Litigation-as Part of Its Ruling That America CVSG was not Insolvent at the Time it Made the Transfer ........................................................................ 39

CONCLUSION ..................................................................................... 44

CERTIFICATE OF COMPLIANCE ........................................................... 45

CERTIFICATE OF SERVICE .................................................................. 45

**TABLE OF AUTHORITIES**

**PAGE**

*Advanced Telecomm. Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.),* 490 F.2d 1325 (11th Cir. 2007)....................................40

*Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252 (5th Cir. 1980)........................6

*Andreini & Co. v. Pony Expresss Delivery Svcs., Inc. (In re Pony Express Delivery Svcs., Inc.)*, 440 F.3d 1296 (11th Cir. 2006)............................................23

*Blixseth v. Kirschner (In re Yellowstone Mtn. Club, LLC),* 456 B.R. 598 (Bankr. D. Mont. 2010)..............................................................20, 27

*Blixseth v. Kirschner (In re Yellowstone Mtn. Club, LLC),* Adv. Pro. No. 09-00014, 2010 WL 3504210 (Bankr. D. Mont. Sept. 7, 2010)..............................20

*Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981) (en banc) .....................6

*Catalyst Pharm., Inc. v. Becerra,* 14 F.4th 1299 (11th Cir. 2021) ...........................27

*Charter v. Bennett (In re Bennett),* Adv. Pro. No. 12-6136-tmr, 2014 WL 293462 (Bankr. D. Ore. Jan. 27, 2014) ..................................................24

*City Nat'l Bank of Fort Smith, Ark. v. Bateman (In re Bateman),* 646 F.2d 1220 (8th Cir. 1981)..........................................................................24

*Dionne v. Keaton (In re XYZ Options, Inc.),* 154 F.3d 1262 (11th Cir 1998)..............................................................................*passim*

*eCapital Comm. Fin. Corp. v. Hitachi Cap. Am. Corp.,* No. 21-CV-60152-STRAUSS, 2022 WL 1320405 (S.D. Fla. May 2, 2022) ......................................29

*ESL Investments, Inc. v. Sears Holdings Corp. (In re Sears Holdings Corp.),* 51 F.4th 53 (2d Cir. 2022).............................................................................41

*Faulkner v. Kornman (In re Heritage Org., L.L.C.),* 413 B.R. 438 (Bankr. N.D. Tex. 2009) ...................................................................24, 29, 41

*Ferguson v. Taylor (In re Taylor),* 642 B.R. 912 (Bankr. W.D. Ark. 2022).....30, 35

*Freeland v. Enodis Corp.*, 540 F.3d 721 (7th Cir. 2008)........................................41

*Fruitticher v. Beach Community Bank,* No. 3:18-cv-1326-JA-EMT,
2019 WL 1082355 (N.D. Fla. Mar. 7, 2019)........................................................25

*Gordon v. Livecchi (In re Livecchi),* Adv. Pro. No. 11-02027,
2014 WL 6668886 (Bankr. W.D.N.Y. Nov. 20, 2014) ...................................32, 35

*Grogan v. Garner,* 498 U.S. 279 (1991)...............................................................23

*In re American Way Service Corp.,* 229 B.R. 496 (Bankr. S.D. Fla. 1999)...........23

*In re Condon,* 198 F. 947 (S.D.N.Y. 1912), *aff'd,* 209 F. 800
(2d Cir. 1913)..........................................................................................................2

*In re Model Imperial, Inc.,* 250 B.R. 776 (Bankr. S.D. Fla. 2000) .........................23

*In the Matter of Xonics Photochemical, Inc.,* 841 F.2d 198 (7th Cir. 1988)......40, 41

*Kaiser Aerospace and Elec. Corp. v. Teledyne Indus., Inc. (In re Piper Aircraft Corp.),* 244 F.3d 1289 (11th Cir. 2001) ......................................................6

*Mane FL Corp. v. Beckman,* 355 So. 3d 418 (Fla. 4th DCA 2023) .........................28

*Marco Elec. Corp. v. Apelman,* No. 8:24-cv-01296-WFJ-SPJ,
2024 WL 4201616 (M.D. Fla. Sept. 16, 2024)......................................................29

*Mittenthal v. Florida Panthers Hockey Club, Ltd.,* 472 F. Supp. 3d 1211
(S.D. Fla. 2020).....................................................................................................35

*Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.),*
904 F.2d 588 (11th Cir. 1990)..........................................................................22, 38

*Oakes v. Spalding (In re Oakes),* 7 F.3d 234 (6th Cir. 1993).................................42

*OHI Asset (VA) Martinsville SNF, LLC v. Wagner (In re Wagner),*
115 F.4th 1296 (11th Cir. 2024)...............................................................................6
*Perrin v. United States,* 444 U.S. 37 (1979)..........................................................27

*Quindlan v. Prudential Ins. Co. of Am.*, 482 F.2d 876 (5th Cir. 1973) ....................25

*QR Tripych, LLC v. LV Midtown, LLC,* 659 B.R. 132 (S.D. Fla. 2024) ...............4, 5

*S.E.C. v. Elliott,* 953 F.2d 1560 (11th Cir. 1992)..................................21, 28, 39, 45

*Sher v. JP Morgan Chase Funding (In re TMST, Inc.),* 610 B.R. 807 (Bankr. D. Md. 2019)..........................................................................................24

*Smith v. United States,* 508 U.S. 223 (1993) .........................................................27

*Stoecklin v. U.S.,* No. 89-182-CIV-OC-16, 1995 WL 835648 (M.D. Fla. Nov. 17, 1995) .....................................................................................29

*Strutton v. Andersen,* No. 22-61294-CIV-ALTMAN/HUNT, 2023 WL 9067767 (S.D. Fla. Nov. 17, 2023) .........................................................29

*TRW Inv. v. Andrews,* 534 U.S. 19 (2001).............................................................20

*U.S. v. Romano,* 757 F. Supp. 1331 (M.D. Fla. 1989)............................................29

*United States v. South Capital Constr., Inc.,* 758 F. App'x 676 (11th Cir. 2018).........................................................................................21, 39, 45

*Wallace v. McFarland (In re McFarland),* Adv. Pro. No. 11091921, 2013 WL 5442406 (Bankr. S.D. Ga. Sept. 30, 2013).............................................24

*Watkins v. Officer Davlin Session,* No. 19-60810-CIV-ALTMAN/Valle, 2021 WL 663762 (S.D. Fla. Feb. 19, 2021) ....................................................20, 26

*Wiggains v. Reed (In re Matter of Wiggains),* 848 F.3d 655 (5th Cir. 2017)...........24

*Woods v. Wal-Mart Transp., LLC,* No. 1:20-CV-3977-TWT, 2022 WL 742856 (N.D. Ga. Mar. 11, 2022) .........................................................24

*Wyly v. Wyly (In re Wyly),* 607 B.R. 862 (Bankr. N.D. Tex. 2018) ........................42

**STATUTES AND OTHER AUTHORITIES**

11 U.S.C. § 101(54)(D)....22

11 U.S.C. § 548(a)(1)(A) ....*passim*

11 U.S.C. § 548(a)(1)(B) ....*passim*

11 U.S.C. § 550(a) ....23

28 U.S.C. § 158(a)(1)....4

2 *Bankruptcy Law Manual* § 9:33 (5th ed.) (June 2024 Update) ....24

Fed. R. Bankr. P. 8002(a)(1)....4, 5

Fed. R. App. P. 4(a)(2)....5

Merriam-Webster (Online) Dictionary ....27, 28

## STATEMENT REGARDING ORAL ARGUMENT

Omar Romay, in his capacity as Liquidating Trustee for the America-CV Station Group, Inc. Liquidating Trust, requests oral argument. Mr. Romay believes that oral argument will materially assist the Court in its decisional process.

## PRELIMINARY STATEMENT

This is a fraudulent transfer case. The Bankruptcy Court committed reversible error in ruling that the Liquidating Trustee failed to establish that the Transfer (defined below) was made with the actual intent to hinder, delay, or defraud creditors under 11 U.S.C. § 548(a)(1)(A)—a statute phrased in the disjunctive—in two ways.

First, the Bankruptcy Court found that (i) "there is *no question* that the ***intent*** of the Transfer was to make it *harder* for creditors to collect any judgment against America CVSG," and (ii) "the movement of cash out of America CVSG…was being considered *as a way* to make collection of any debt of America CVSG *more challenging*." Notwithstanding these findings of fact (and others, including those arising from an "extensive" April 4, 2018, WhatsApp conversation), the Bankruptcy Court committed reversible error in failing to rule that the Transfer was made with actual intent to "hinder" or "delay" creditors—*without reference* to intent to "defraud" or a non-exclusive list of what are commonly referred to as "badges" of fraud. Reference to intent to "defraud" and the badges of fraud is unnecessary because § 548(a)(1)(A) is phrased in the disjunctive and direct evidence of actual

intent to "hinder" or "delay" exists and was found by the Bankruptcy Court. This is the unusual fraudulent transfer case because direct evidence of actual intent, independent of any badges of fraud, exists as explicitly found by the Bankruptcy Court, and evidence admitted during the trial demonstrated the defendant's awareness of legal exposure to a fraudulent transfer claim.

The Bankruptcy Court ignored the fact that § 548(a)(1)(A) is phrased in the disjunctive. The Bankruptcy Court read the words "hinder" and "delay" straight out of the statute, or rendered them superfluous by concluding that the Liquidating Trustee failed to establish actual intent to "defraud" while expressly finding that the subject transfer was intended to make the creditor's enforcement and collection efforts more difficult and to delay such efforts. This ruling constitutes reversible error. Numerous courts have held, and commentators have recognized, that § 548(a)(1)(A) is phrased in the disjunctive, and actual intent to "hinder" or "delay" is sufficient to state a claim. Indeed, as far back as 1912, Judge Learned Hand recognized that "[t]he ancient phrase 'to hinder, delay, or defraud,' *has always been in the disjunctive*, and an intent to hinder *or* delay is adequate *even if it be not an intent to defraud*." *In re Condon*, 198 F. 947, 950 (S.D.N.Y. 1912), *aff'd*, 209 F. 800 (2d Cir. 1913) (emphasis supplied).

Second, the Bankruptcy Court committed reversible error in finding that the Liquidating Trustee only established one badge of fraud. In fact, the Bankruptcy

Court identified at least *three* badges of fraud in its opinion: (i) not just threatened, but pending litigation against America CVSG at the time of the Transfer; (ii) America CVSG's receipt of less than reasonably equivalent value and, in fact, no value at all in exchange for the Transfer; and (iii) movement of cash out of America CVSG with the intent to make it "harder," "more challenging," and "more difficult" for creditors to collect on monies that might be due them if they were successful in pending litigation. This error is critical. Under Eleventh Circuit caselaw, while one badge of fraud is insufficient to establish the requisite intent, two or three badges can suffice.

Regarding the Liquidating Trustee's constructive fraud claim under 11 U.S.C. § 548(a)(1)(B), the Bankruptcy Court also committed reversible error in its valuation of America CVSG's contingent liability related to claims asserted against it in state court litigation pending at the time of the Transfer by not starting the downward adjustment from the asserted face amount of the claim. In doing so, the Court misconstrued language from an Eleventh Circuit opinion stating that "a contingent liability cannot be valued at its potential face amount." All this language means is that the face value of the claim is the *starting point* for the downward adjustment. If the Bankruptcy Court had applied the amount sought in the state court complaint as its starting point in its valuation of the contingent liability (and adjusted nothing else in its analysis), the Bankruptcy Court's downward adjustment would have resulted

in a finding that America CVSG was insolvent on the date of the Transfer. Given its finding of fact that America CVSG received no value, the Bankruptcy Court would have been compelled to rule that the Liquidating Trustee established his constructive fraud claim under § 548(a)(1)(B).

**STATEMENT OF APPELLATE JURISDICTION**

"The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees...of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under [28 U.S.C. § 157]." *QR Tripych, LLC v. LV Midtown, LLC,* 659 B.R. 132, 135-36 (S.D. Fla. 2024) (citing 28 U.S.C. § 158(a)(1)). An appellant must file a notice of appeal within 14 days after entry of a judgment, order, or decree. Fed. R. Bankr. P. 8002(a)(1). The Liquidating Trustee timely and properly invoked this Court's jurisdiction by filing his (i) *Notice of Appeal* on October 2, 2024 [ECF No. 361] within 14 days after entry of the Bankruptcy Court's *Memorandum Opinion on Final Judgment* on September 18, 2024, [ECF No. 356] (the "Mem. Op."), and (ii) *Amended Notice of Appeal* on October 7, 2024 [ECF No. 372] within 14 days after entry of the *Final Judgment* on October 2, 2024 [ECF No. 362].[1] Accordingly, this Court possesses subject matter jurisdiction over this appeal under 28 U.S.C. § 158(a)(1).

[1] Because as of the fourteenth day after entry of the Mem. Op. on the Bankruptcy Court's docket, the Bankruptcy Court had not yet entered its *Final Judgment*, Bankruptcy Rule 8002(a)(1) compelled the Liquidating Trustee to file his *Notice of Appeal* of the Mem. Op. by October 2, 2024. *See* Fed. R. Bankr. P. 8002(a)(1). In order to fully protect his rights, the Liquidating Trustee

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

I. Whether the Bankruptcy Court committed reversible error in concluding that the Liquidating Trustee failed to establish actual intent to hinder, delay, or defraud under § 548(a)(1)(A).[2]

II. Whether the Bankruptcy Court committed reversible error in its valuation of a contingent liability— the claims asserted in state court litigation—as part of its ruling that America CVSG was not insolvent at the time it made the Transfer.

## STANDARD OF APPELLATE REVIEW

In bankruptcy appeals, the district court functions as an appellate court. *QR Tripych,* 659 B.R. at 136 (citation omitted). A district court "review[s] the bankruptcy court's legal conclusions *de novo*, but must accept the bankruptcy court's factual findings unless they are clearly erroneous." *Id.* (quotation and citations omitted). "De novo review requires the court to make a judgment independent of the bankruptcy court's, without deference to that court's analysis and

---

filed his *Amended Notice of Appeal* five days after entry of the *Final Judgment* on the Bankruptcy Court's docket. The initial *Notice of Appeal* should be deemed filed as of entry of the *Final Judgment* on the Bankruptcy Court's docket. *See* Fed. R. App. P. 4(a)(2) ("*Filing Before Entry of Judgment.* A notice of appeal filed after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry.").

[2] This issue is a consolidation of the first three issues identified in the Liquidating Trustee's Designation of Record and Issues on Appeal filed with the Bankruptcy Court, one of the documents transmitted by the Bankruptcy Court to this Court. [Case No. 1:24-cv-23819, ECF No. 13, Item No. 3].

conclusions." *Kaiser Aerospace and Elec. Corp. v. Teledyne Indus., Inc. (In re Piper Aircraft Corp.),* 244 F.3d 1289, 1295 (11th Cir. 2001) (citation omitted). "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 258 (5th Cir. 1980) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395 (1948)).[3] "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985). "The clearly erroneous standard does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced it would have decided the case differently." *OHI Asset (VA) Martinsville SNF, LLC v. Wagner (In re Wagner),* 115 F.4th 1296, 1303 (11th Cir. 2024).

## **STATEMENT OF THE CASE**

### **I. Nature of the Case**

This is an appeal of adverse rulings in a fraudulent transfer adversary proceeding brought by the Liquidating Trustee against Mediaset España

[3] Decisions handed down by the former Fifth Circuit prior to October 1, 1981, constitute binding Eleventh Circuit precedent. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Communicación, S.A., n/k/a Grupo Audiovisual Mediaset España Communicación, S.A.U. ("Mediaset"), pursuant to 11 U.S.C. § 548(a)(1)(A) and (a)(1)(B).

The Court should reverse the Bankruptcy Court's ruling on the Liquidating Trustee's § 548(a)(1)(A) claim because multiple findings of fact made by the Bankruptcy Court in the opinion subject of this appeal established that the Transfer was made with actual intent to "hinder" or "delay" creditors. The elements of the statute at issue here are phrased in the disjunctive. The Liquidating Trustee did not have to prove intent to "defraud" or the presence of so-called badges of fraud in order to prevail. Courts rely on such badges where there is no direct evidence of fraud. But here, such direct evidence exists, and was in fact expressly found by the Bankruptcy Court. And when such direct evidence exists, reference to or findings regarding the existence of the badges of fraud are unnecessary.

The Bankruptcy Court also committed reversible error in finding only one badge of fraud when, in fact, in its opinion it found at least three: (i) receipt of less than reasonably equivalent value for the Transfer, and in fact receipt of no value; (ii) not just threatened, but pending litigation against the Debtor-transferor at the time of the Transfer; and (iii) movement of funds out of the Debtor-transferor with the actual intent to make it "harder," "more difficult," and "more challenging" for

creditors to recover debt that would have been due had the Romay Parties been successful in pending litigation.[4]

This Court should also reverse the Bankruptcy Court's ruling on the Liquidating Trustee's constructive fraudulent transfer claim under 11 U.S.C. § 548(a)(1)(B). The Bankruptcy Court misconstrued language in the controlling Eleventh Circuit case which requires that the starting point for valuing a contingent liability is the face amount of the claim. Had the Bankruptcy Court done so, it would have concluded that Debtor-transferor America CVSG was insolvent on the date of the Transfer and, therefore, that the Liquidating Trustee had established his claim under § 548(a)(1)(B).

## II. Course of Proceedings and Disposition Below

On May 14, 2019, America-CV Station Group, Inc. ("American CVSG" or the "Debtor") filed its Chapter 11 case before the U.S. Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") under Case No. 19-16355-BKC-LMI. [ECF No. 356 at 2[5]]. Three affiliated companies also filed bankruptcy: Caribevision Holdings, Inc. ("Caribevision") under Case No. 19-16359, America-

[4] The Liquidating Trustee argued that there were at least 4 badges of fraud: (i) prior to the Transfer the transferor had been sued; (ii) the Transfer was of substantially all of the Debtor's cash assets; (iii) the Debtor received less than reasonably equivalent value; and (iv) the Transfer was to an entity with a close relationship to the debtor. *See* [ECF 349 at 10-11].

[5] Unless otherwise indicated, all references to "ECF No. __" in this Brief shall be to the docket of the Bankruptcy Court in the underlying Adversary Proceeding filed by the Liquidating Trustee against Mediaset, assigned Adv. Pro. No. 21-01059-LMI (the "AP").

CV Network, LLC ("America-CV Network") under Case No. 19-16976-BKC-AJC, and Caribevision TV Network LLC ("Caribevision Network") under Case No. 19-16977-BKC-AJC (collectively, the "Affiliated Debtors," and with America CVSG, the "Debtors"). [ECF No. 356 at 2-3].

On February 24, 2021, Omar Romay, in his capacity as Liquidating Trustee (the "Liquidating Trustee") for the America-CV Station Group, Inc. Liquidating Trust (the "Liquidating Trust"), filed a complaint commencing the AP. [ECF No. 1].

On April 5, 2022, the Bankruptcy Court entered an order denying Mediaset's motion to dismiss the AP (the "Order Denying MTD"). [ECF No. 37].

On April 24, 2022, the District Court (Scola, J.) entered an order denying Mediaset's motion for leave to appeal the Order Denying MTD. [ECF No. 50].

On August 16, 2022, the Bankruptcy Court entered an Order granting the Liquidating Trustee's motion to strike Mediaset's affirmative defenses.[6] [ECF No. 58].

On January 13, 2023, the Affiliated Debtors' bankruptcy cases were reassigned to Hon. Laurel M. Isicoff. *See* [ECF No. 66 (Notice of Reassignment)].

On November 13, 2023, the Liquidating Trustee and Mediaset filed a joint waiver of jury trial and consent to trial before the Bankruptcy Court. [ECF No. 145].

---

[6] This Order is a subject of Mediaset's cross-appeal. [ECF No. 379 at 2 (stating that it filed its cross-appeal "as a conditional cross appeal should the District Court reverse or modify any aspects of the Bankruptcy Court's Final Judgment, in a manner adverse to Defendant Mediaset.")].

Between March 13-20, 2024, the Bankruptcy Court conducted a trial of the AP. *See* [ECF Nos. 329-334 (trial transcripts)].

On April 18, 2024, the Bankruptcy Court entered an Order denying Mediaset's *ore tenus* motion for judgment on partial findings.[7] [ECF No. 335].

On April 26, 2024, the Bankruptcy Court entered an Order denying Mediaset's motion for summary judgment seeking a determination that the Liquidating Trustee lacked standing to prosecute the AP (the "Standing Order").[8] [ECF No. 337].

On May 9, 2024, the Bankruptcy Court entered an Order granting the Liquidating Trustee's motion for judgment on partial findings regarding Mediaset's first affirmative defense in ECF No. 64: to the extent it was an initial transferee, it took the Transfer in good faith and for value pursuant to 11 U.S.C. § 548(c). [ECF No. 340 (Order) and ECF No. 339 (April 15, 2024, Hr'g Transcript at 28-32)].[9]

On May 14, 2024, the Bankruptcy Court entered an Order denying Mediaset's motion for summary judgment seeking a determination that the Bankruptcy Court lacked *in personam* jurisdiction over it (the "Jurisdiction Order"). [ECF No. 342].[10]

---

[7] This Order is a subject of Mediaset's cross-appeal. [ECF No. 379 at 2].
[8] The Standing Order is a subject of Mediaset's cross-appeal. [ECF No. 379 at 2].
[9] The Bankruptcy Court explained it was not ruling on the issue of good faith, just the lack of value provided in return for the Transfer. [ECF No. 339 at 29]. Mediaset withdrew its second affirmative defense. [ECF No. 339 at 5-6].
[10] The Jurisdiction Order is subject of Mediaset's cross-appeal. [ECF No. 379 at 1-2]. Pending before the Bankruptcy Court is Mediaset's motion for reconsideration of this Order [ECF No. 353],

On September 18, 2024, the Bankruptcy Court entered its Mem. Op. [ECF No. 356].

On October 2, 2024, the Liquidating Trustee filed his *Notice of Appeal* of the Mem. Op. [ECF No. 361].

On October 2, 2024, *after* the filing of the Liquidating Trustee's *Notice of Appeal*, the Bankruptcy Court entered its *Final Judgment*. [ECF No. 362].

On October 7, 2024, the Liquidating Trustee filed his *Amended Notice of Appeal,* adding the subsequently entered *Final Judgment*. [ECF No. 372].

This appeal is properly before the Court pursuant to 28 U.S.C. § 158(a)(1).

## III. Statement of Facts

In 2008, Mediaset purchased a minority interest in Pegaso Television, Inc. ("Pegaso"). Mem. Op. at 4. Pegaso owned a minority interest in Caribevision, *id.*,[11] each involved in the Broadcast Business (as defined below). After Mediaset purchased its interest in Pegaso, Caribevision and the Romay Parties[12] entered into

the Liquidating Trustee's response [ECF No. 373], and Mediaset's reply, as amended. [ECF No. 393].

[11] Caribevision held 50% of the equity and 100% of the voting rights in America CVSG at the time of the Transfer, with the Romay Parties owning the remaining 50%. *See* [ECF No. 1, ¶ 13]. At all relevant times, Carlos Vasallo, Marcel Felipe, Angel Santamaria, Fernando Calles, Emilio Braun, and Ana Cristina Castilla comprised Caribevision's Board of Directors. [ECF No. 1, ¶ 14; Mem. Op. at 5 and n.8]. Ms. Castilla and Mr. Santamaria were the Mediaset representatives on Caribevision's Board of Directors. [ECF No. 1, ¶ 15; Mem. Op. at 5 and n.8].

[12] The phrase "Romay Parties," as defined in the Debtor's Chapter 11 Plan, are Omar Alejandro Saul Romay, Okeechobee Television Corp., Promisa, Inc., Sherjan Broadcasting, Inc., Telecenter, Inc., and America Teve Network, Inc. Mem. Op. at 3 n.2. However, the Romay Parties are not the Plaintiff-Appellant in this appeal. Mr. Romay in his capacity as Trustee of the Liquidating Trust is the Plaintiff-Appellant. [ECF No. 1; ECF No. 362].

a joint venture arrangement pursuant to which Caribevision owned 50% of America CVSG and Omar Romay ("Romay"), in his individual capacity, together with other of the Romay Parties, owned the other 50%. *Id*. at 5.

In 2011, Caribevision, along with other entities holding direct or indirect interests in the operation of television and radio stations in the United States (the "Broadcast Businesses"), including Mediaset, sued the Romay Parties and others (the "First Romay State Court Litigation"). Mem. Op. at 4, 6.

In November 2015, a $58 million verdict was entered in favor of Caribevision, Mediaset, and others against the Romay Parties and other defendants. *Id*. Around this time, the FCC scheduled what is called a "reverse auction" for broadcast licenses. *Id*.

On December 7, 2015, the parties to the First Romay State Court Litigation agreed to liquidate their businesses pursuant to a settlement in which America CVSG (the entity that owned the broadcast licenses used in the Broadcast Businesses) would sell those licenses through an FCC reverse auction (the "FCC Auction"), with the proceeds to be distributed pursuant to a waterfall of the sale proceeds. *See* Mem. Op. at 6. Settlement of the First Romay State Court Litigation was reflected in a Confidential Settlement Agreement (the "CSA"). *Id*.

Under the CSA, the entities responsible for making decisions about management of the Auction as well as of America CVSG and America-CV Network,

as well as distribution of any auction proceeds were Caribevision, Caribevision Network, and Caribevision Station Group, LLC. Mem. Op. at 6-7.

America CVSG was cognizant of the risk and potential exposure that might flow from a decision to refuse to distribute any of the FCC Auction Proceeds (as defined below) to the Romay Parties under the CSA, as reflected in, for example, a May 23, 2017, email from Marcel Felipe ("Felipe"), counsel for and a director of Caribevision, noting—

> In other words, under any of the variations mentioned by Telecinco[13], Romay would take between $3,300,000 and $5,060,000. This does not include the possibility of the court interpreting the contract as Romay argues it to be to the effect that WJAN's $25,000,000 must be part of the entire cascade and that it should be given an additional $8,800,000. In other words, Romay could receive between $3,300,000 and $13,860,000 if the matter were litigated, and in any event it would receive a minimum of between $3,300,000 and $5,060,000. In addition, since $3,300,000 is its worst case scenario in the event it lost everything, I don't believe it would settle for that amount. In the best case scenario we could hope for a settlement of $4,000,000 and $6,000,000 and that would be a victory. That's why I don't understand the assessment that we don't need to give anything to Romay, as to assume otherwise could prove very costly to the company.

Joint Trial Exhibit J-12 *See* [ECF No. 299 (Plaintiff Liquidating Trustee Omar Romay and Defendant Mediaset España Communicacion S.A. Joint Exhibit Register)]; *see also* [ECF No. 332 at 770-72 (Mar. 18, 2024, trial testimony by Felipe regarding the fact that under the CSA the Romay Parties would get none of the FCC

[13] Telecinco is Mediaset's prior corporate name. *See* Mem. Op. at 4 n.7 ("Mediaset was formerly known as Gestavision Telecinco, S.A.").

Auction Proceeds, that it would lead to litigation, it ultimately resulted in a bankruptcy filing, and Felipe was "completely opposed" to the decision to transfer those proceeds out of America CVSG)]. Omar Ortega of Dorta & Ortega, outside litigation counsel to America CVSG, concurred with Felipe's assessment of the problem and risks. *See* Joint Trial Exhibit J-12 [ECF No. 299 (Plaintiff Liquidating Trustee Omar Romay and Defendant Mediaset España Communicacion S.A. Joint Exhibit Register)]; [ECF No. 331 (Mar. 15, 2024, Trial Transcript) at 493:4-19].

On October 14, 2017, Felipe reiterated his concerns about manner in which America CVSG intended to distribute the FCC Auction Proceeds and the potential litigation following demands made by the Romay Parties, in an e-mail correspondence (the "Oct. 14, 2017 Felipe Correspondence") noting:

> As you may know, Mr. Omar Romay had demanded a payment of $8.8 Million from the FCC Auction proceeds. This amount coincides with the amount, which I had previously advised may be due to him. He also demands fifty percent of the value of the Puerto Rico stations and is claiming they should have been sold instead of removed from the FCC Auction. The value of their claim, once Puerto Rico is included, could easily exceed the proceeds we collected in the auction.

*Id.* (Oct. 14, 2017 Felipe email with reply). The Oct. 14, 2017, Felipe Correspondence went on to emphasize the likelihood of litigation from the Romay Parties and cautioned about fraudulent transfer exposure in the event the FCC Auction Proceeds were diverted, noting:

> [A]s of April, as per Telecinco's request you [*sic*] Board prohibited the Company's officers from reaching or proposing any agreement with

> Mr. Romay. As such, unless such decisions is reversed, litigation is not only likely, but inevitable and in [*sic*] will commence relatively quickly.
>
> Please note that under the Florida law, distributing money out of an entity in the [*sic*] to its shareholders, so that the company is left without the ability to pay its foreseeable debts, makes such money collectible from the shareholders who received it or individually from the Directors who authorize it.
>
> As such, under these circumstances, it is my opinion and advice that the Company does not release any of the FCC Auction proceeds until this matter is fully resolved and the amount of liability is established.

Trial Exhibit P-28 [admitted into evidence at ECF No. 333 at 80:11-13].

The agreements reflected in the CSA with respect to disposition of the proceeds generated by the FCC Auction (the "FCC Auction Proceeds") were never realized given the assets sold and amount of proceeds generated (which fell far short of what was anticipated). *See* Mem. Op. at 7. Unsurprisingly, disputes arose almost immediately about Romay's entitlement to any of the FCC Auction Proceeds. *Id*. Ultimately, Caribevision decided not to distribute any of the FCC Auction Proceeds to the Romay Parties. *See id*.

On December 12, 2017, the Romay Parties initiated a lawsuit against America CVSG, Caribevision, Caribevision Network, and Caribevision Station Group, LLC, and Spanish Broadcasting Systems, Holdings Group, Inc. seeking to recover what the Romay Parties claimed was their share of the FCC Auction Proceeds and other damages (the "Second Romay State Court Litigation"). Mem. Op. at 7. In the Second

Romay State Court Litigation, the Romay Parties asserted a total claim of $21,000,000.00. *Id.*[14]

On March 23, 2018, Mediaset and Grupo Colte, S.A. de C.V. ("Grupo Colte"), the largest shareholder of Pegaso, entered into a Share and Purchase Agreement whereby Grupo Colte agreed to purchase Mediaset's shares in Pegaso (the "SPA"). *Id*. at 7-8.[15] Pursuant to the SPA, Grupo Colte purchased from Mediaset 21,594,787 shares of stock (the "Shares") in Pegaso for $12.5 million, payable in three installments, with the first installment being $10 million. *Id.* at 8; ECF No. 1, ¶ 19.

On April 23, 2018, America CVSG sent a wire transfer in the amount of $10,000,000 from its Iberia Bank account to Mediaset (the "Transfer"). Mem. Op. at 8.

On April 1, 2019, approximately one year after the Transfer, the state court before which the Second Romay State Court Litigation was pending entered its order determining that the state court plaintiffs' litigation claims were entitled to $9,320,609, the highest range set forth in a non-final Order. Mem. Op. at 20; Joint

[14] In actuality, the state court complaint sought at least $21,500,000. *See* Joint Trial Exhibit J-82 (Dec. 12, 2017 Complaint, Omar Romay, et al. v. Caribevision Holdings, Inc., et al., Case No. 17-028393-CA 44, Miami-Dade County Circuit Court), ¶ 31("As a proximate result of the foregoing, the Okeechobee Plaintiffs have been damaged in excess of $21,500,000.00"). *See* [ECF No. 299 (Plaintiff Liquidating Trustee Omar Romay and Defendant Mediaset España Communicacion S.A. Joint Exhibit Register)].

[15] America CVSG was neither a party to the SPA nor did it receive any of the Shares under the SPA. *See id.*; ECF No. 1, ¶¶ 22-23; Joint Trial Exhibit J-26 [ECF No. 299 (Plaintiff Liquidating Trustee Omar Romay and Defendant Mediaset España Communicacion S.A. Joint Exhibit Register)]. Pegaso was neither a party to the SPA nor did it receive any of the Shares under the SPA. *See id.*

Trial Exhibit J-103 [ECF No. 299 (Plaintiff Liquidating Trustee Omar Romay and Defendant Mediaset España Communicacion S.A. Joint Exhibit Register)].[16]

On May 14, 2019, America-CV Station filed its Chapter 11 case before the Bankruptcy Court under Case No. 19-16355-BKC-LMI. [ECF No. 1, ¶ 5; ECF No. 356 at 2]. The Affiliated Debtors filed their own bankruptcy cases under Case No. 19-16977-BKC-AJC. [ECF No. 1, ¶ 5; ECF No. 356 at 2-3]. Based upon the rulings of the court in the Second Romay State Court Litigation, the Romay Parties filed joint and several claims for $12,919,740.88 against each of America CVSG and the Affiliated Debtors (the "Romay Claim") in each of the bankruptcy cases. Memo. Op. at 3.

On February 26, 2020, America CVSG filed its Chapter 11 Plan of Reorganization which was premised on a settlement of the Second Romay State Court Litigation by and between the Debtor, the Affiliated Debtors, and the Romay Parties. *Id.* In relevant part, the Plan provided that the Romay Claim would be

---

[16] The State court's *Order Interpreting Confidential Settlement Agreement as a Matter of Law* set a range of $8,867,909.60 to $9,320,609.40 to which the state court plaintiffs were entitled depending on additional findings related to certain potential credits. Joint Trial Exhibits J-101 and J-115 [ECF No. 299 (Plaintiff Liquidating Trustee Omar Romay and Defendant Mediaset España Communicacion S.A. Joint Exhibit Register)]. It did not include the valuation of the Puerto Rico assets that had been taken out of the FCC Auction. *See id.*; Joint Trial Exhibit 100 at 49:22-50:12 [ECF No. 299 (Plaintiff Liquidating Trustee Omar Romay and Defendant Mediaset España Communicacion S.A. Joint Exhibit Register)]. The state court plaintiffs' share of the Puerto Rico assets and the value of the credits, if any, was to be subject of the jury trial that was stayed by the Debtors' bankruptcy filings. Joint Trial Exhibit 15 at 19 [ECF No. 299 (Plaintiff Liquidating Trustee Omar Romay and Defendant Mediaset España Communicacion S.A. Joint Exhibit Register)]. In other words the state court plaintiffs had a clear possibility of exceeding the $9,320,609.00 figure in state court. *See id.*

satisfied, in part, by assignment to the Liquidating Trust of a fraudulent conveyance action to recover the Transfer. *Id.*

On February 24, 2021, Omar Romay, in his capacity as Liquidating Trustee for the Liquidating Trust, filed a complaint commencing the AP. [ECF No. 1]. The complaint was an action to avoid and recover the Transfer. *See id.*; Mem. Op. at 8. The source of the $10 million comprising the Transfer was the FCC Auction Proceeds. [ECF No. 1, ¶ 24].[17]

On April 26, 2024, the Bankruptcy Court entered the Standing Order. [ECF No. 337].

On May 14, 2024, the Bankruptcy Court entered the Jurisdiction Order. [ECF No. 342].

On September 18, 2024, the Bankruptcy Court entered the Mem. Op. [ECF No. 356].

On October 2, 2024, the Liquidating Trustee filed his *Notice of Appeal*. [ECF No. 361].

[17] The Bankruptcy Court noted that "[t]here was no promissory note evidencing an obligation from Pegaso to America CVSG. None of Pegaso's books or records, or tax returns, ever listed an obligation from Pegaso to America CVSG. There was a $10,000,000.00 promissory note signed near the time of the Transfer, with Pegaso as the borrower and America Teve Holdings, Inc. as the lender. That promissory note does reference the purchase of the Mediaset Shares. However, Pegaso was not the purchaser of the Mediaset Shares – Grupo Colte was. And America Teve Holdings, Inc. did not provide the funds for the Transfer; that was America CVSG." Mem. Op. at 10.

On October 2, 2024, the Bankruptcy Court entered the Final Judgment. [ECF No. 362].

On October 7, 2024, the Liquidating Trustee filed his *Amended Notice of Appeal*. [ECF No. 372].

**SUMMARY OF THE ARGUMENT**

The Bankruptcy Court committed reversible error in failing to find that the Liquidating Trustee established that the Transfer was made with actual intent to "hinder" or "delay" creditors under § 548(a)(1)(A) given the findings of fact the Bankruptcy Court made regarding the Debtor's intent behind the Transfer. Where, like here, there is direct evidence of actual intent, reference to badges of fraud is unnecessary. *See Dionne v. Keaton (In re XYZ Options, Inc.),* 154 F.3d 1262, 1271 (11th Cir. 1998) ("Because proof of "actual intent to hinder, delay, or defraud" creditors, pursuant to 11 U.S.C. § 548, may rarely be accomplished by direct proof, the Trustee argues that courts may infer fraudulent conduct from the circumstantial evidence and the surrounding circumstances of the transactions. We agree with the Trustee. In determining whether the circumstantial evidence supports an inference of fraudulent intent, courts should look to the existence of certain badges of fraud."); *Blixseth v. Kirschner (In re Yellowstone Mtn. Club, LLC),* 436 B.R. 598, 661 (Bankr. D. Mont. 2010) ("Actual intent may be established either by *direct or circumstantial* evidence. Circumstantial evidence can be used to establish the existence of "badges

of fraud[.]") (emphasis supplied), *amended on reconsideration on other grounds*, Adv. Pro. No. 09-00014, 2010 WL 3504210 (Bankr. D. Mont. Sept. 7, 2010).

The Bankruptcy Court ignored the fact that § 548(a)(1)(A) is phrased in the disjunctive. *See Watkins v. Officer Davlin Session,* No. 19-60810-CIV-ALTMAN/Valle, 2021 WL 663762, at * 6 (S.D. Fla. Feb. 19, 2021) (criticizing a Florida Supreme Court opinion for, among other things, construing a statute in a way that "ignore[d]" its "disjunctive composition"). The Bankruptcy Court simply read the words "hinder" and "delay" straight out of the statute, or rendered them superfluous by concluding that the Liquidating Trustee failed to establish actual intent to "defraud." *See TRW Inv. v. Andrews,* 534 U.S. 19, 31 (2001) (explaining that construing a statute so as to avoid rendering any clause, sentence, or word "superfluous, void, or insignificant" is "a cardinal principle of statutory construction") (quotation and additional citations omitted).

Alternatively, if reference to the badges of fraud was necessary (it was not), the Bankruptcy Court committed reversible error in finding that only one badge of fraud was present when its Mem. Op. explicitly found at least three. This error led the Bankruptcy Court to ultimately conclude that the Liquidating Trustee had not established actual intent under § 548(a)(1)(A) based on the Eleventh Circuit's opinion in *XYZ Options, Inc.* which holds that, while a confluence of badges can establish actual intent, one is insufficient. 154 F.3d at 1271 n.17. This ruling

constitutes reversible error given Eleventh Circuit caselaw, and substantial lower court caselaw, holding that even two badges of fraud "may very well be enough" to establish actual intent under § 548(a)(1)(A). *S.E.C. v. Elliott*, 953 F.2d 1560, 1568 (11th Cir. 1992); *see also United States v. South Capital Constr., Inc.,* 758 F. App'x 676, 681 (11th Cir. 2018) (affirming district court determination after bench trial that plaintiff had established actual intent to defraud after finding three badges of fraud present).

If this Court agrees with the foregoing primary or alternative arguments, it can and should reverse and remand with direction to the Bankruptcy Court to enter judgment for the Liquidating Trustee as no additional fact finding is needed. Were this Court to do so, it need not address the Liquidating Trustee's secondary argument that the Bankruptcy Court misconstrued language in the Eleventh Circuit's opinion in *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.),* 904 F.2d 588, 594 (11th Cir. 1990), by not valuing a contingent liability based on state court litigation by starting the downward calculation from the face amount of the $21.5 million claim. Had the Bankruptcy Court properly construed the relevant language in *Chase & Sanborn*, it would have had to conclude that the Debtor was insolvent when it made the Transfer and the Liquidating Trustee established the elements of

his constructive fraud claim under 11 U.S.C. § 548(a)(1)(B) given its prior finding of fact that America CVSG received no value in return for the Transfer.

## ARGUMENT

### I. The Bankruptcy Court Committed Reversible Error in Concluding that the Liquidating Trustee Failed to Establish Actual Intent to Hinder, Delay, or Defraud Under § 548(a)(1)(A).

#### A. Legal Standards

Section 548(a)(1)(A) of the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(A) (hereafter, "§ 548(a)(1)(A)"), authorizes avoidance of transfers of property or interests in property within 2 years of a bankruptcy filing where such transfer was made "with actual intent to hinder, delay, or defraud" any present or future creditor of the transferor. *See id.* The term "transfer" is defined in 11 U.S.C. § 101(54)(D) expansively as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with—(i) property; or (ii) an interest in property."[18] *See id.* Transfers that are avoided can be recovered under 11 U.S.C. §

[18] Mediaset did not dispute that the Liquidating Trustee timely commenced the AP under § 548(a)(1)(A). The Bankruptcy Court noted that it was undisputed that "(a) the $10 million that is the subject of the Transfer was property of the Debtor on the date of the Transfer, and (b) the Transfer was made within two years of the Petition Date." Mem. Op. at 8 n.11; *see also* Mem. Op. at 4 n.5 (noting withdrawal by Mediaset of its second affirmative defense, that to the extent the proceeds constituting the Transfer derived from the FCC Auction such funds did not constitute property of the bankruptcy estate). The Bankruptcy Court previously granted the Liquidating Trustee's motion for summary judgment and denied Mediaset's cross motion for summary judgment on whether the Liquidating Trustee possessed standing to seek to avoid and recover the Transfer. *See* [ECF No. 337].

550(a) against initial or immediate or mediate transferees. *See id.*[19] The party seeking to avoid a transfer as actually fraudulent must establish actual intent by a preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279, 286, (1991); *In re Model Imperial, Inc.,* 250 B.R. 776, 790–91 (Bankr. S.D. Fla. 2000); *In re American Way Service Corp.,* 229 B.R. 496, 525 (Bankr. S.D. Fla. 1999).

"The phrase "intent to hinder, delay, or defraud" is not defined in the Bankruptcy Code. We find relevant meaning in the fact that the phrase is stated in the disjunctive, which signifies that an intent to hinder or to delay or to defraud is sufficient." *Wiggains v. Reed (In the Matter of Wiggains)*, 848 F.3d 655, 662 (5th Cir. 2017) (citations omitted)[20] (emphasis supplied); *see also, e.g., Faulkner v.*

---

[19] Mediaset appears to have disputed that it was the "initial transferee" of the Transfer under Section 550(a)(1) of the Bankruptcy Code. *See* [ECF No. 64 at 7 ("To the extent Mediaset is an initial transferee (an assertion it disputes)…. )]. But the Bankruptcy Court previously found that Mediaset conceded that it was the direct recipient of the Transfer. *See* [ECF No. 58 at 5-6 (rejecting affirmative defenses that Mediaset was a "subsequent transferee" and therefore received the Transfer in good faith and without knowledge of its avoidability as "belied by Mediaset's *direct receipt of the Transfer as admitted by Defendant*….") (emphasis supplied)]. As the direct recipient, Mediaset was the initial transferee under § 5501(a)(1) because it had the right to put the funds paid to it for its own purposes. *See Andreini & Co. v. Pony Express Delivery Svcs., Inc. (In re Pony Express Delivery Svcs., Inc.)*, 440 F.3d 1296, 1300 (11th Cir. 2006) (entity receiving transfer is "initial transferee" if it exercises legal control over the property received, such that it has the right to use the property for its own purposes).

[20] *Accord Sher v. JP Morgan Chase Funding (In re TMST, Inc.),* 610 B.R. 807, 827 (Bankr. D. Md. 2019) ("Section 548(a)(1)(A) is drafted in the disjunctive—the Court need only find that the Amended Counts state a claim that the Debtors…made relevant transfers with the intent to hinder, the intent to delay, *or* the intent to defraud.) (emphasis in original); *Charter v. Bennett (In re Bennett),* Adv. Pro. No. 12-6136-tmr, 2014 WL 293462, at *5 (Bankr. D. Ore. Jan. 27, 2014) ("[B]ecause § 548(a)(1)(A) is stated in the disjunctive, intent to merely hinder or delay, as opposed to defraud, is sufficient to support a claim.") (citation omitted); *Wallace v. McFarland (In re McFarland),* Adv. Pro. No. 11091921, 2013 WL 5442406, at *11 (Bankr. S.D. Ga. Sept. 30, 2013) ("The statutory clause is in the disjunctive and thus is satisfied by establishing one intent—whether it is to hinder, delay, or defraud a current or future creditor.") (citation omitted); Hon. Joan N.

*Kornman, (In re Heritage Org., L.L.C.),* 413 B.R. 438, 469-71 (Bankr. N.D. Tex. 2009) (finding direct evidence of intent to "hinder" or "delay" in transaction, including a purported shareholder distribution, orchestrated to move assets out of reach of creditors pursuing the debtor in litigation, and then *alternatively* finding the presence of multiple badges of fraud); *City Nat'l Bank of Fort Smith, Ark. v. Bateman (In re Bateman),* 646 F.2d 1220, 1225 n.5 (8th Cir. 1981) (applying identical intent to hinder, delay, or defraud language from the Bankruptcy Act of 1898, concluding bankruptcy and district courts committed reversible error ending their inquiry on objection to discharge of debt after determining lack of intent to defraud, without considering proof of intent to hinder or delay, then finding evidence sufficient to establish such intent and reversed and rendered judgment for objecting creditor); *Fruitticher v. Beach Community Bank*, No. 3:18-cv-1326-JA-EMT, 2019 WL 1082355, at *4-5 (N.D. Fla. Mar. 7, 2019) (district court reversed summary judgment for creditor in action seeking denial of debtor's discharge of debt, but concurred with bankruptcy court that 11 U.S.C. § 727(a)(2)(A), which requires a showing of actual

---

Freeney and Michael J. Stepan, Esq., 2 *Bankruptcy Law Manual* § 9:33 (5th ed.) (June 2024 Update) ("The paradigm of actual fraudulent intent, namely the "hinder, delay, or defraud" language set forth in § 548(a)(1)(A), is phrased in the disjunctive, and thus only one of the three components need be proven.") (citation omitted); *see also, e.g., Woods v. Wal-Mart Transp., LLC,* No. 1:20-CV-3977-TWT, 2022 WL 742856, at *2 (N.D. Ga. Mar. 11, 2022) (construing O.C.G.A. § 13-6-11 which provides that a jury may allow litigation expenses where defendant "has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense," stating that "[t]he three conditions for recovering litigation expenses under this statute are disjunctive; that is, "the plaintiff may show that any one of the three conditions exists—bad faith, stubborn litigiousness, or unnecessary trouble and expense.") (quotation omitted).

intent to hinder, delay, or defraud creditors, was phrased in the disjunctive, and noted that construing the statute that way "comports with the well-known canon of statutory construction directing courts to avoid readings of statutes that render words or phrases superfluous."); *see generally Quindlen v. Prudential Ins. Co. of Am.,* 482 F.2d 876, 878 (5th Cir. 1973) (As "a general rule, the use of a disjunctive in a statute indicates alternatives and requires that those alternatives be treated separately. *Hence, language in a clause following a disjunctive is considered inapplicable to the subject matter of the preceding clause*.") (emphasis supplied).[21]

The plain language in § 548(a)(1)(A), phrased in the disjunctive, and prevailing caselaw construing it, directly call into question the Bankruptcy Court's "finding that Plaintiff has not satisfied his burden of proof to demonstrate there was an actual intent to *defraud* creditors at the time of the Transfer." Mem. Op. at 35 (emphasis supplied). In short, because the Bankruptcy Court's own findings of fact clearly established actual intent to "hinder" or "delay" (in fact, both), there was no need for the Liquidating Trustee to prove actual intent to "defraud," or for the Bankruptcy Court to address whether the Liquidating Trustee had established such intent.

The Bankruptcy Court ignored the fact that § 548(a)(1)(A) is phrased in the disjunctive. *See Watkins,* 2021 WL 663762, at * 6 (criticizing a Florida Supreme

[21] *See* Note 3, *supra*.

Court opinion for, among other things, construing a statute in a way that "ignore[d]" its "disjunctive composition"). The Bankruptcy Court read the words "hinder" and "delay" straight out of the statute, or rendered them superfluous by concluding that, based on its review of the totality of the evidence, the Liquidating Trustee failed to establish actual intent to "defraud." *See TRW Inv.,* 534 U.S. at 31 (explaining that construing a statute so as to avoid rendering any clause, sentence, or word "superfluous, void, or insignificant" "is a cardinal principle of statutory construction").

Where, like here, there is direct evidence of actual intent, a court need not look to the existence of the non-exclusive list of "badges" of fraud. *See XYZ Options,* 154 F.3d at 1271 ("Because proof of "actual intent to hinder, delay, or defraud" creditors, pursuant to 11 U.S.C. § 548, may rarely be accomplished by direct proof, the Trustee argues that courts may infer fraudulent conduct from the circumstantial evidence and the surrounding circumstances of the transactions. We agree with the Trustee. In determining whether the circumstantial evidence supports an inference of fraudulent intent, courts should look to the existence of certain badges of fraud."); *Blixseth,* 436 B.R. at 661 ("Actual intent may be established either by direct or

circumstantial evidence. Circumstantial evidence can be used to establish the existence of "badges of fraud[.]").[22]

The words "hinder" and "delay" are not defined in the Bankruptcy Code. Accordingly, these words should be given their "ordinary or natural meaning." *Smith v. United States,* 508 U.S. 223, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning.") (citing *Perrin v. United States,* 444 U.S. 37, 42 (1979)).[23] Merriam-Webster (Online) Dictionary defines "hinder" as a transitive verb "to make slow or difficult the progress of," and an intransitive verb "to hold back."[24] Merriam-Webster (Online) Dictionary defines "delay" as a transitive verb "to stop, detain, or hinder for a time," and an intransitive verb "to cause delay."[25] *See id.* The Bankruptcy Court's findings of fact that the Transfer was made with the intent and as a way to make it "harder,"

---

[22] "(1) The transfer was to an insider; (2) The debtor retained possession or control of the property transferred after the transfer; (3) The transfer was disclosed or concealed; (4) Before the transfer was made the debtor had been sued or threatened with suit; (5) The transfer was of substantially all the debtor's assets; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." *XYZ Options*, 54 F.3d at 1272. These badges of fraud derived from Alabama state law, but they are substantially similar to the badges of fraud recognized under Florida law. *See* Fla. Stat. § 726.105(2).

[23] *Accord Catalyst Pharm., Inc. v. Becerra,* 14 F.4th 1299, 1307 (11th Cir. 2021) ("As we have recognized, [w]e interpret words that are not defined in a statute with their ordinary and plain meaning because we assume that Congress uses words in a statute as they are commonly understood.") (quotation omitted).

[24] https://www.merriam-webster.com/dictionary/hinder

[25] https://www.merriam-webster.com/dictionary/delay

"more challenging," and "more difficult" for creditors to collect on monies that might be due if successful in pending litigation fits comfortably within the scope of the everyday definitions of "hinder" and "delay."

If, and to the extent, a court appropriately considers badges of fraud, while according to the Eleventh Circuit one is insufficient, the "confluence of several can constitute conclusive evidence of an actual intent to defraud." *XYZ Options,* 154 F.3d at 1271 n.17 (quotation omitted). In fact, the Eleventh Circuit and lower courts within this circuit have recognized that even two badges "may very well be enough" to establish actual intent. *Elliott*, 953 F.2d at 1568; *see also Mane FL Corp. v. Beckman,* 355 So. 3d 418, 426 (Fla. 4th DCA 2023) ("Two or three badges of fraud can be enough to support a finding of actual intent to defraud.") (citing cases including [*In re*] *Jennings*, 332 B.R. [465] at 472 & n.7 [(Bankr. M.D. Fla. 2005)] (finding actual intent to defraud based upon two badges of fraud, coupled with the timing of the transaction)).[26]

[26] *See also, e.g., Marco Elec. Corp. v. Apelman,* No. 8:24-cv-01296-WFJ-SPF, 2024 WL 4201616, at *3 (M.D. Fla. Sept. 16, 2024) (denying motion to dismiss count alleging actual fraud finding that the complaint adequately alleged three badges of fraud); *Strutton v. Anderson,* No. 22-61294-CIV-ALTMAN/HUNT, 2023 WL 9067767, at *3 (S.D. Fla. Nov. 17, 2023) (in addressing an exemption issue Magistrate Judge found that three badges of fraud could well justify a finding that defendant engaged in the funds transfer to protect them from plaintiff's claims, but recommended effectively staying the matter in favor of state court proceedings in Colorado); *eCapital Comm. Fin. Corp. v. Hitachi Cap. Am. Corp.,* No. 21-CV-60152-STRAUSS, 2022 WL 1320405, at *10 (S.D. Fla. May 2, 2022) (denying motion for summary judgment on actual fraud claim finding that the complaint adequately alleged three badges of fraud, stating that "[g]iven that at least three badges of fraud are present here, a reasonable factfinder could find for Hitachi on the issue of actual fraudulent intent.") (citing *South Capital Constr., supra*); *Stoecklin v. U.S.,* No. 89-182-CIV-OC-16, 1995 WL 835648, at *5 (M.D. Fla. Nov. 17, 1995) ("the Court finds that the three

**B. <u>Analysis</u>**

After having considered the parties' testimonial and documentary evidence, the Bankruptcy Court made multiple findings of fact that establish actual intent to "hinder" or "delay" under § 548(a)(1)(A). Given these findings, the Bankruptcy Court committed reversible error in failing to conclude, *as a matter of law,* that the Liquidating Trustee established his claim under § 548(a)(1)(A). *See, e.g., Faulkner, supra,* 413 B.R. at 469-71 (finding direct evidence of intent to "hinder" or "delay" in a transaction and then, in the alternative, finding the presence of multiple badges of fraud). Instead, the Bankruptcy Court erroneously concluded that because it only found a single badge of fraud—*despite having found at least three*— and because the court determined the Debtor was not insolvent at the time of the transfer, the Liquidating Trustee did not establish actual intent to "defraud."

**(i) The Bankruptcy Court's Findings of Fact Established Actual Intent to "Hinder" or "Delay" Under § 548(a)(1)(A).**

The Bankruptcy Court correctly focused on the evidence demonstrating the Debtor's intent in making the Transfer, alternatively describing the Debtor's end game of making it "harder," Mem. Op. at 35, "more difficult," *id.* at 36, and "more challenging," *id.* at 37, for a creditor to collect on a debt or judgment that might be

---

badges of fraud, viewed together, demonstrate Kenneth Stoecklein's intent to delay, hinder and defraud the government."); *U.S. v. Romano,* 757 F. Supp. 1331, 1337 (M.D. Fla. 1989) ("When taken together these [three] badges of fraud demonstrate the existence of fraud per se on the Romanos' part.").

obtained in pending litigation. More specifically, the Bankruptcy Court found that (i) "there is no question that the *intent* of the Transfer was to make it *harder* for creditors to collect any judgment against America CVSG," and (ii) "the movement of cash out of America CVSG…was being considered *as a way* to make collection of any debt of America CVSG *more challenging*." *Id.* at 35 and 37 (emphasis supplied).

Among other things, the Bankruptcy Court relied on an "extensive" WhatsApp conversation on April 4, 2018, between Marcel Felipe (counsel for Caribevision, a minority shareholder in America CVSG, and member of America CVSG's Board of Directors), and Fernando Calles (the corporate representative of Grupo Colte, the largest shareholder in Pegaso of which Mediaset was a minority shareholder), and testimony regarding discussions about using America CVSG funds to pay Grupo Colte's obligation to Mediaset that occurred approximately three weeks later, at the time of the Transfer. *See id.* at 32. More specifically, the Bankruptcy Court found that the WhatsApp discussion concerned

> how to protect the assets of, it appears, America CVSG from any creditors who, based on the WhatsApp conversation, would be seeking to collect a judgment.[[27]] In a lengthy exchange, Mr. Felipe explains how the transfer of funds, which would be used to purchase the assets

[27] In a footnote to this statement the Bankruptcy Court stated that "[m]ost of the conversation appears to focus on how the equity in Caribevision would be reallocated once Grupo Colte bought out Mediaset's interest in Pegaso. The actual phrase "collect a judgment" is not used but it is *clear* from the conversation that is the nature of the concerns about transferring cash out of America CVSG by using the cash to invest in an affiliate – apparently America-CV Network." *Id.* at 32 n.22 (emphasis supplied).

> of America-CV Network, would be "asset protection" and "we get protection against creditors in general". This discussion *clearly* contemplates that the funds invested in America-CV Network could then be used by America-CV Network to send to Pegaso for the purchase of the Mediaset Shares.

*Id.* (second footnote omitted) (emphasis supplied).

The Bankruptcy Court noted Mr. Calle's question of whether the Transfer would be considered an "Act in Creditor Fraud," and Mr. Felipe's response describing the Transfer as a "fraudulent conveyance," but concluded that it would not be deemed such a conveyance because (according to him), America CVSG did not as a result become insolvent. *See id.* at 32-33. Mr. Felipe's conclusion, however, was flawed and irrelevant to a claim that the Transfer was made in violation of § 548(a)(1)(A) which *only* requires establishing actual intent to hinder, delay, or defraud creditors with no reference to any insolvency-related matter as an element of the cause of action. *See* § 548(a)(1)(A); *Ferguson v. Taylor (In re Taylor)*, 642 B.R. 912, 921 n.5 (Bankr. W.D. Ark. 2022) ("The Court need not analyze whether the debtor was *actually* insolvent on the date of the transfers because proving actual insolvency *is not necessary for the trustee to prevail under § 548(a)(1)(A)*.") (initial emphasis in original, second emphasis supplied) (citation omitted); *see also Gordon v. Livecchi (In re Livecchi),* Adv. Pro. No. 11-02027, 2014 WL 6668886, at *4 (Bankr. W.D.N.Y. Nov. 20, 2014) ("The Trustee does not allege that the Debtor…was insolvent on the date of the transfer or rendered insolvent because

those elements are *not relevant* to an action sounding in actual fraud under 11 U.S.C. § 548(a)(1)(A))...") (emphasis supplied); *Compare* 11 U.S.C. § 548(a)(1)(A) with 11 U.S.C. § 548(a)(1)(B)(ii).

The Bankruptcy Court also referenced the fact that, after the Transfer, Mr. Felipe acknowledged that America CVSG lacked sufficient money to fund a $5 million settlement, and more importantly, that post-Transfer "it would have been *harder* for the Romay Parties to collect any judgment if they prevailed in the Second Romay State Court Litigation." Mem. Op. at 33 (emphasis supplied). Rejecting Mediaset's argument that there was no evidence that the Transfer was made with the actual intent to make it more difficult for the Romay Parties to collect any judgment they might obtain, even though that might be the effect, the Bankruptcy Court found that that argument was "directly contradict[ed]" by Mr. Felipe's statement in the above-referenced WhatsApp conversation. Mem. Op. at 34. The Bankruptcy Court found that "there is *no question* that Mr. Felipe recognized, and shared with Mr. Calles, that transferring the cash in America CVSG into another type of tangible asset *would make it more difficult to collect by a creditor*." *Id.* (emphasis supplied). In a footnote, the Bankruptcy Court added that since it already found that the Debtor was paying expenses as they became due, "presumably the creditors about which Mr. Felipe was most concerned were the Romay Parties." *Id.* at 34 n.25.

Mr. Ortega, outside counsel to America CVSG, testified that the Transfer would delay the Romay Parties from collecting on what they were due if they were successful in court. *See* [ECF No. 331 (Trial Transcript) at 493:4-19 ("Q. Mr. Ortgea, you're a litigator; correct? A. Many years, yes. Q. And in this case, as we've seen, the Romay creditor parties were seeking their share from the [FCC] auction proceeds; right? A. Correct. Q. And that was the subject of the eventual litigation in state court that commenced in December of 2017; right? A. Yes. Q. Okay, and I'm asking you, from your understanding at the time, *would moving and distributing the* [FCC] *auction proceeds delay the Romay creditor parties from collecting what they were due if they were ultimately successful in court*? A. *Yes*.") (emphasis supplied)].

James S. Feltman, one of Mediaset's expert witnesses, agreed that the Transfer made it more difficult for the Romay Parties to collect on any judgment they might have obtained, as the Transfer reduced cash on hand at America CVSG from approximately $12.8 million to approximately $2.8 million:

> Q. …So, on April 22nd, 2018, America-CV Station Group, a defendant in that action, had $12.8 million in cash in its bank account, right, it had -- which is what, through the balance sheet, you identified no secured creditors against it, so it's unrestricted cash, that then moved out the following day, *that would make it harder for the state court plaintiffs to obtain a recovery, should they be successful, correct*?
> A. It would depend on the facts and circumstances as to where the cash went, and what the rights were to recover against cash transfers.
> Q. So --
> A. *But, generally speaking, yes*.
> Q. And in this case the cash went to a Spanish company, right, called Mediaset, correct?

> A. Yes.
> Q. So, it would make it even harder because now it's offshore, it's not even a U.S. entity, correct?
> A. There would be -- in my view there would be other claims or causes of action, but if that was the only hypo -- *yes, it would be harder to collect.*

[ECF No. 334 (Mar. 20, 2024, Trial Transcript) at 1245:11-1246:6 (emphasis supplied)].

Based on the foregoing findings of fact (as well as the testimony by Mr. Ortega and Mr. Feltman), the Bankruptcy Court should have concluded, *as a matter of law*, *and without reference to intent to "defraud" or the badges of fraud*, that the Liquidating Trustee established his fraudulent transfer claim under § 548(a)(1)(A). The Bankruptcy Court's failure to conclude that the Liquidating Trustee established his fraudulent transfer claim under § 548(a)(1)(A) constituted reversible error. To the extent that the Bankruptcy Court concluded that because America CVSG retained assets after the Transfer that precluded a finding of actual intent under § 548(a)(1)(A), *see* Mem. Op. at 35-36, that conclusion also constituted reversible error. If the fact that executable assets remained with America CVSG after the Transfer somehow obviated actual intent, then § 548(a)(1)(A) would have to include a clause at the end stating "unless assets remain after such transfer or obligation was incurred to satisfy creditor claims." But § 548(a)(1)(A) contains no such clause, 11 U.S.C. § 548(a)(1), and as this Court noted in *Mittenthal v. Florida Panthers Hockey Club, Ltd.,* 472 F. Supp. 3d 1211, 1221 (S.D. Fla. 2020), courts are "not free to add

words to a statute that do not appear there." *Id.* (citation omitted). Indeed, insolvency is not a requirement to state a claim under 548(a)(1)(A). *See Ferguson*, 642 B.R. at 921 n.5; *see also Gordon,* 2014 WL 6668886, at *4. Ultimately, however, the discussion of assets remaining with America CVSG after the Transfer appears to be *dictum* because the Bankruptcy Court ultimately concluded that movement of funds out of America CVSG constituted a badge of fraud.

A ruling by this Court reversing the Bankruptcy Court's conclusion that the Liquidating Trustee had not established actual intent under § 548(a)(1)(A) would be entirely consistent with the Bankruptcy Court's denial of Mediaset's *ore tenus* motion for judgment on partial findings after the close of Plaintiff's evidence—as well as Mediaset's evidence—that the Liquidating Trustee had established a *prima facie* case of actual intent under § 548(a)(1)(A). *See* [ECF No. 333 (Mar. 19, 2024, trial transcript) at 1074:22-1075:4 ("I find that with respect to actual intent, based on the badges of fraud that were identified in the presentation by counsel for the plaintiff, *that plaintiff has met his prima facie burden with respect to actual intent*. At this juncture of the case, I am not prepared to find that a preponderance of the evidence cuts against the plaintiff's prima facie case.") (emphasis supplied)].

What is striking about the Bankruptcy Court finding that the Liquidating Trustee had met his *prima facie* case of demonstrating actual intent, but then concluding he failed to establish actual intent in its Mem. Op., is that the *only*

witnesses who testified after the former ruling were two defense experts, Harold Furchtgott-Roth and Mr. Feltman. Mr. Furchtgott-Roth testified about issues which only go to the Liquidating Trustee's claim that the Transfer was *constructively* fraudulent under 11 U.S.C. § 548(a)(1)(B). *See* Mem. Op. at 14-18, 24. Mr. Feltman testified regarding the constructive fraud claims, too, *see id.* at 12, 14, 20, but also in respect of the Liquidating Trustee's § 548(a)(1)(A) claim. *See* [ECF No. 317 (Mar. 18, 2024, Declaration of James S. Feltman), ¶¶ 64 and 88-89[28]]. Stated differently, after the Bankruptcy Court found that the Liquidating Trustee had met his *prima facie* case of demonstrating actual intent after hearing from *both* parties' fact witnesses, the Bankruptcy Court was not presented with any fact-based testimony or evidence beyond which it had already heard. This necessarily raises the question of how the Bankruptcy Court reached the conclusion set forth in its Mem. Op. that the Liquidating Trustee had not established actual intent when the Bankruptcy Court previously concluded that the Liquidating Trustee had met his prima facie case of establishing such intent. Simply stated, these two conclusions cannot be reconciled.

---

[28] Mr. Feltman testified that "no witness has testified that the Transferor paid Mediaset with the intent to hinder, delay, or defraud the Romay litigation parties." [ECF No. 317, ¶ 64]. Mr. Feltman appears to have ignored (i) the above-referenced evidence of an "extensive" WhatsApp conversation on April 4, 2018, between Marcel Felipe and Fernando Calles referenced by the Bankruptcy Court, Mem. Op. at 32-22; and (ii) the BK Court's findings of fact, among others, that "there is no question that the *intent* of the Transfer was to make it harder for creditors to collect any judgment against America CVSG," and (ii) "the movement of cash out of America CVSG…was being considered *as a way* to make collection of any debt of America CVSG more challenging," Mem. Op. at 35 and 37 (emphasis supplied), findings made after considering the parties' evidence.

**(ii) If the Bankruptcy Court Properly Considered Badges of Fraud, it Committed Reversible Error in Finding Only One Had Been Established When, in Fact, Its Opinion Found Three.**

Alternatively, to the extent the Bankruptcy Court properly considered the badges of fraud, its conclusion that the Liquidating Trustee established only one is demonstrably wrong. This error served as the foundation for the Bankruptcy Court's ultimate conclusion that the Liquidating Trustee had not established actual intent under *XYZ Options* which holds that, while a confluence of badges may infer actual intent, one is insufficient. 154 F.3d at 1271 n.17.

Specifically, the Bankruptcy Court found as factual matters the existence of at least three badges of fraud: (i) America CVSG received less than reasonably equivalent value, and in fact no value, in return for the Transfer, Mem. Op. at 9-13 and 36 (noting that it had "*already found* that America CVSG did not receive reasonably equivalent value for the Transfer.") (emphasis supplied); (ii) at the time of the Transfer not only was there threatened litigation against America CVSG, but actual pending litigation, *id.* at 35 ("There is no question that at the time of the Transfer America CVSG had been threatened with a lawsuit, indeed, it (along with other defendants) had been sued and the Second Romay State Court Litigation *was pending*.") (emphasis supplied); and (iii) $10 million was moved out of America CVSG to make collection "harder," "more difficult," and "more challenging." *See id.* at 36-37 ("The only "badge" of fraud this Court finds to be present is that the

movement of cash out of America CVSG, however it was accomplished, was being considered as a way to make collection of any debt of America CVSG more challenging.").[29]

Accordingly, the Bankruptcy Court committed reversible error in concluding that the Liquidating Trustee established only one badge of fraud. Because at least three badges were present based on the Bankruptcy Court's findings, *supra*, its conclusion that a claim of actual intent under § 548(a)(1)(A) had not been established constituted reversible error. *See Elliott*, 953 F.2d at 1568 (noting that even two badges "may very well be enough" to establish actual intent); *South Capital Constr.,* 758 F. App'x at 681 (affirming district court determination after bench trial that plaintiff had established actual intent to defraud after finding three badges of fraud present); Note 26, *supra* (caselaw holding two or three badges of fraud suffice).

Based on the foregoing, this Court can and should reverse the Bankruptcy Court and remand with direction for it enter judgment for the Liquidating Trustee on his § 548(a)(1)(A) claim. Because there are more than sufficient facts as found by the Bankruptcy Court which, at a minimum, establish actual intent to "hinder" or "delay," there is no need to remand for further fact finding. Accordingly, this Court

---

[29] A finding in respect of reasonably equivalent value is "largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts." *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 593 (11th Cir. 1990) (quoting *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 829–30 (5th Cir. 1959).

can and should reverse and remand with direction for the Bankruptcy Court to enter judgment for the Liquidating Trustee on his § 548(a)(1)(A) claim.

## II. The Bankruptcy Court Committed Reversible Error in its Valuation of a Contingent Liability-the Claims Asserted in State Court Litigation-as Part of Its Ruling That America CVSG was not Insolvent at the Time it Made the Transfer.[30]

In its analysis of whether the Debtor was insolvent at the time of the Transfer, the Bankruptcy Court committed reversible error in calculating the amount of the contingent liability of the claim asserted in the Second Romay State Court Litigation by not starting at the $21.5 million face value demanded in the complaint. Note 14, *supra*. The Bankruptcy Court found it appropriate to focus on the status of the litigation, rejecting the amount demanded as a starting point. *See* Mem. Op. at 25.

The Bankruptcy Court first cited to the Eleventh Circuit's opinion in *Advanced Telecomm. Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.),* 490 F.2d 1325 (11th Cir. 2007) as setting the framework for valuation of a contingent liability. *See* Mem. Op. at 20. The Bankruptcy Court then quoted the Eleventh Circuit's opinion in *Chase & Sanborn,* stating that "[i]t is well established that 'a contingent liability cannot be valued at its potential face amount….'" Mem. Op. at 20 (quoting *Chase & Sanborn,* 904 F.2d at 594 (citing *In the Matter of Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988)). The Bankruptcy Court then

[30] This argument concerns the Liquidating Trustee's constructive fraudulent transfer claim under 11 U.S.C. § 548(a)(1)(B) only.

cited the Seventh Circuit's opinion in *Xonics Photochemical, Inc.* for the proposition that "contingent liabilities [are] not valued at face amounts, even if no uncertainty about what firm will owe *if* the contingency materializes." *Id.* at 21 (emphasis supplied by the Bankruptcy Court).

Taken together, these statements simply mean that the face value of the liability cannot itself be the contingent value for purposes of establishing whether a transferor is insolvent on the date of the transfer, but instead that the downward adjustment should be made from the face amount of the asserted claim. The *Xonics* court said as much by stating that "[t]here is a compelling reason not to value contingent liabilities on the balance sheet at their face amounts, even if that would be possible to do because the liability, despite being contingent, is for a specified amount (that is, even if there is no uncertainty about what the firm will owe *if* the contingency materializes). By definition, a contingent liability is not certain—and often is highly unlikely—ever to become an actual liability. To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real." *Xonics,* 841 F.2d at 200 (emphasis in original).

In fact, one of the cases cited by the Bankruptcy Court says the same thing. Quoting from *In re The Heritage Org., supra,* 375 B.R. at 284, the Bankruptcy Court stated that a court "should multiply the *face amount of the…liability* times the probability that the contingency will occur." Mem. Op. at 20 (emphasis supplied).

*Accord ESL Investments, Inc. v. Sears Holdings Corp. (In re Sears Holdings Corp.),* 51 F.4th 53, 66-67 (2d Cir. 2022) (after quoting from *Xonics, supra,* regarding valuation of contingent liabilities, the Second Circuit provided the following example: "For instance, a contingent liability with a face value of $100, but only a 25% chance that the contingency comes to pass, should be valued at $25. *Cf. id.* (giving similar example)."); *Freeland v. Enodis Corp.,* 540 F.3d 721, 730 (7th Cir. 2008) ("Because an entity's liability on a contingent debt may never come into being, a contingent liability is not valued at its full amount when assessing the entity's solvency. Rather, a contingent liability is valued at its face amount multiplied by the probability that it will become due.") (citing *Xonics, supra*); *Oakes v. Spalding (In re Oakes),* 7 F.3d 234 (6th Cir. 1993) (Table) ("To determine the value of a contingent liability, the court should multiply the total debt guaranteed by the probability that the debtor will be required to fulfill the guarantee.") (citing *Covey v. Commercial Nat'l Bank,* 960 F.2d 657, 659 (7th Cir. 1992)); *Wyly v. Wyly (In re Wyly),* 607 B.R. 862, 876 (Bankr. N.D. Tex. 2018) ("Most courts apply the probability-discount approach the Trustees propose when considering the complexities of valuing contingent debt. That approach requires a court to discount the face value of the contingent liability by the probability that it will become real, resulting in a face value of less than 100%.").

Here, the Bankruptcy Court engaged in an analysis of expert testimony, the procedural history and status of the Second Romay State Court Litigation, certain issues raised by the parties' pleadings, and discussions among related persons, including possible settlement amounts, but rejected the $21 million sought as the starting point for the downward adjustment without any explanation or citation to any authority for doing so. *See* Mem. Op. at 25 (referencing expert testimony for the Liquidating Trustee using the face value as the starting point despite views of insiders and outside litigation counsel regarding the value of the affirmative litigation claims).[31] In support of this ruling the Bankruptcy Court cited *Chase & Sanborn* for the proposition that "contingent liability cannot be valued as potential face amount". *Id.*

But the Liquidating Trustee did not posit that the value of the contingent liability should be the $21.5 million face value of the claim. Instead, the Liquidating Trustee posited that that the amount of the face value of the claim should be the starting point for a downward adjustment for calculating the value of the contingent liability. Ultimately, the Bankruptcy Court valued the contingent liability at $3.6 million. *Id.* at 27. This valuation disregarded the $21.5 million demanded in the state court complaint.

---

[31] As stated, the actual amount sought was $21.5 million. Note 14, *supra*.

Had the Bankruptcy Court started its downward adjustment from the $21.5 million sought, it would have found the Debtor to be balance sheet insolvent by approximately $88,532, calculated as follows: Total Assets $9,277,000 [=$2,900,000 (cash)[32] + $2,063,000 (value of WJAN station broadcast license)[33] + $4,314,000 (value of WJPX and WJWN Puerto Rico station broadcast licenses)[34]] – Total Liabilities $765,532[35] – Value of contingent litigation liability $8,600,000.[36] The $8.6 million figure represents a 40% discount of the $21.5 million sought by the Romay Parties in the Second Romay State Court Litigation. The 40% discount was that applied by the Bankruptcy Court in its valuation of the contingent liability. *See* Mem. Op. at 24 ($9 million value x .40 = $3.6 million).

In this scenario—*which assumes the correctness of the Bankruptcy Court's factual findings* (other than the wrongly stated $21 million figure sought in the complaint, to the extent the figure was a finding of fact)—the Bankruptcy Court would have been compelled to conclude that the Liquidating Trustee had established his claim that the Transfer was constructively fraudulent. *See* 11 U.S.C. §

32 Mem. Op. at 27.
33 Mem. Op. at 19.
34 *Id.*
35 [ECF No. 317-1 (Exhibit to Mar. 18, 2024, Declaration of James S. Feltman) at 68].
36 Joint Trial Exhibit J-82 (Dec. 12, 2017 Complaint, Omar Romay, et al. v. Caribevision Holdings, Inc., et al., Case No. 17-028393-CA 44, Miami-Dade County Circuit Court). *See* [ECF No. 299 (Plaintiff Liquidating Trustee Omar Romay and Defendant Mediaset España Communicacion S.A. Joint Exhibit Register), at 8-9].

548(a)(1)(B)(ii)(I) (a transfer can be avoided as constructively fraudulent where the transferor received less than reasonably equivalent value (as previously found by the Bankruptcy Court, Mem. Op. at 9-13), and the transferor was insolvent on the date of the transfer or became insolvent as a result of the transfer).

Based on the foregoing, the Bankruptcy Court committed reversible error in not using the $21.5 million demanded as the starting point for its downward adjustment of the valuation of the contingent liability represented by the Second Romay State Court Litigation.

## **CONCLUSION**

This Court should reverse the Bankruptcy Court's holding that the Liquidating Trustee failed to establish his § 548(a)(1)(A) claim and remand with direction for the Bankruptcy Court to enter judgment for the Liquidating Trustee. The Bankruptcy Court committed reversible error in not concluding, based on the findings of fact it made, that the Liquidating Trustee had established actual intent to "hinder" or "delay" based on the fraud was proper, the Bankruptcy Court committed reversible error in concluding that only such badge was present, when it had found at least three, and relying upon the rule stated in *XYZ Options* that one badge of fraud is insufficient to establish actual intent. Based on the three badges it found, the Bankruptcy Court should have found actual intent under the Eleventh Circuit's opinions in *Elliott* and *South Capital Constr., supra.* If this Court reaches the issue

of the Bankruptcy Court's valuation of the contingent liability, it should reverse because the Bankruptcy Court failed to start the downward adjustment from the face value of the demand in the underlying state court complaint.

## CERTIFICATE OF COMPLIANCE

**I HEREBY CERTIFY** that this Brief complies with the typeface requirements set forth in Fed. R. Bankr. P. 8015(a)(5)(A) and (a)(7)(B)(i). This Brief was prepared in Microsoft Word 14-point Times New Roman type and contains 12,085 words.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on the 2nd day of December, 2024, by electronic transmission through the Court's CM/ECF system upon all parties on the attached CM/ECF Service List.

Dated: December 2, 2024

BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

By: */s/ Paul A. Avron*
Paul Steven Singerman
Florida Bar No. 378860
Paul A. Avron
Florida Bar No. 50814
pavron@bergersingerman.com

and

Isaac Marcushamer, Esq.
Florida Bar No. 0060373
isaac@dgimlaw.com
Monique D. Hayes, Esq.
Florida Bar No. 0841573
monique@dgimlaw.com
DGIM LAW PLLC
2875 NE 191st Street, Suite 705
Aventura, FL 33180
Phone: (305) 763-8708

*Co-Counsel for Appellant, Omar Romay, Liquidating Trustee*

**CM/ECF SERVICE LIST**

- **Paul A. Avron**
  pavron@bergersingerman.com,mmorgan@bergersingerman.com,drt@ecf.inforuptcy.com,efile@bergersingerman.com,drt@bergersingerman.com
- **Isaac Meyer Marcushamer**
  isaac@dgimlaw.com,isaac_876@ecf.courtdrive.com,colleen@dgimlaw.com,veronica@dgimlaw.com,eservice@dgimlaw.com,monique@dgimlaw.com
- **Noticing Bankruptcy Court**
  CMECF_support@FLSB.uscourts.gov
- **Darrell Winston Payne**
  dpayne@stearnsweaver.com,cveguilla@stearnsweaver.com
- **Leanne McKnight Prendergast**
  Leanne.Prendergast@pierferd.com
- **Patricia Ann Redmond**
  predmond@stearnsweaver.com,cgraver@stearnsweaver.com,rross@stearnsweaver.com,jmartinez@stearnsweaver.com,jless@stearnsweaver.com,mharder@stearnsweaver.com,mfernandez@stearnsweaver.com